UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Steven Huard,
    Petitioner

    v.                                  Civil No. 10-cv-258-SM
                                        Opinion No. 2010 DNH 197
United States of America,
    Respondent

**O R D E R**

Steven Huard was convicted by a jury of conspiracy to commit bank robbery, bank robbery, and the use of a firearm in furtherance of a crime of violence. He was sentenced to 360 months of imprisonment and his conviction was affirmed on appeal. He now seeks habeas corpus relief on grounds that his trial counsel provided constitutionally deficient representation. 28 U.S.C. § 2255.

For the reasons discussed below, Huard's petition for a writ of habeas corpus is necessarily denied.

**Background**

On October 19, 2005, Steven Huard and Sean King drove a stolen Cadillac STS to the Bellwether Credit Union in Manchester, New Hampshire. The men, both of whom were armed with handguns and wearing disguises to conceal their identities, entered the

institution.  King wore dark clothing and Huard wore a red and white windbreaker jacket.  Huard approached one of the tellers, flashed his firearm, demanded money, and told the teller that if he included any "bait bills" or "dye packs," Huard would kill him.  Meanwhile, King approached a nearby teller station and jumped the counter - forensic examination would later reveal that the shoe print left on the counter matched King's sneaker.  Huard provided King with a bag, into which he stuffed cash from the teller's drawer.

After taking more than $18,000 in cash, the men fled to the parking lot and drove off in the stolen Cadillac.  In all, they were inside the credit union for just over a minute.  Although their identities were obscured, witnesses (both inside and outside the credit union) described their clothing, build, height, skin color, firearms, and getaway vehicle.  The credit union's surveillance video confirmed the witnesses' descriptions of the men.

Police subsequently recovered the stolen Cadillac.  Although the vehicle had been wiped clean of any finger prints, police discovered a portion of a torn latex glove bearing Huard's finger print inside the car.  Police also received a tip that King had been bragging about the robbery and his girlfriend, Charlene

Claps, might have knowledge about the robbery. When police interviewed Claps, she told them (and later testified at trial) that: the day before the robbery, she saw Huard and King wearing latex gloves and wiping down the stolen Cadillac; she was present when Huard and King left the Cadillac at a hotel parking lot in Manchester; several hours after the robbery, King showed her approximately $10,000 in cash, which she helped him sort and count; after the robbery, King burned Huard's red and white windbreaker - a jacket Claps had seen Huard wearing on several occasions - near some railroad tracks in Manchester; the weapons used in the robbery and shown on surveillance video were consistent with weapons owned by (or at least possessed by) Huard and King; and on the morning following the robbery, King had shown her, and insisted that she read, a newspaper article describing the robbery.

Based on the information Claps provided, police located Huard's partially-burned red and white jacket. And, when police later searched King's personal effects, they discovered the newspaper article Claps had described.

Meanwhile, not long after the robbery, Huard made a large purchase. He bought a used Ford Windstar, paying for it in cash. Subsequently, Officer Cogswell, a police officer in Billerica,

Massachusetts, was informed by fellow law enforcement officers that Huard was believed to be operating a green Ford Windstar with an unauthorized license plate.  Officer Cogswell was also told that Huard's driver's license had been revoked.  Later that day, Cogswell saw Huard driving the Windstar, ran a check on the license plate, and learned that it had been stolen.  He activated the cruiser's blue lights and attempted to stop Huard.  Huard fled, briefly leading the officer on a car chase, speeding through residential areas.  At times, Huard drove on the wrong side of the road.  Eventually, Huard drove back to his own residence, jumped out of the vehicle, and ran toward, and dove through, an open basement window.  Officer Cogswell followed in hot pursuit.  After a brief but violent struggle in the basement, Huard was subdued and removed from the house.  During the struggle, two things happened.  First, Officer Cogswell noticed that Huard had taken something from his jacket and attempted to conceal it under a tarp on the floor.  Second, Huard knocked Cogswell's hat off his head and onto the floor.

Outside, Huard continued to struggle with the assisting police officers, but was eventually subdued and secured in the back of a police car.  Officer Cogswell then went back into the basement to recover his hat.  As he was picking up his hat, Cogswell saw a .45 caliber Ruger automatic handgun lying on the

floor (in plain view), in the area where he had previously noticed Huard attempting to conceal something he had removed from his jacket.  The officer recovered that weapon.  Subsequently, Huard was removed from the police car and the area inside was searched.  Officers found seven rounds of .45 caliber ammunition in the rear passenger area, where Huard had been sitting.

The firearm recovered from the basement lies at the core of Huard's habeas corpus petition.  Huard asserts that his defense counsel provided constitutionally deficient representation because he did not move to suppress that firearm and offered no objection to its introduction into evidence at trial.  He points to other instances of allegedly deficient representation as well, but those contentions are vague, poorly developed, and, in any event, without merit.

**Standard of Review**

I.   <u>28 U.S.C. § 2255 Generally</u>.

Huard seeks habeas corpus relief under 28 U.S.C. § 2255, which provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is

>    otherwise subject to collateral attack, may move the
>    court which imposed the sentence to vacate, set aside
>    or correct the sentence.

28 U.S.C. § 2255(a). To prevail on his ineffective assistance of counsel claim, Huard must "show, by a preponderance of the evidence, that [his] trial counsel's conduct fell below the standard of reasonably effective assistance <u>and</u> that counsel's errors prejudiced the defense." <u>Gonzalez-Soberal v. United States</u>, 244 F.3d 273, 277 (1st Cir. 2001) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). <u>See also</u> <u>Cofske v. United States</u>, 290 F.3d 437 (1st Cir. 2002). In assessing the quality of trial counsel's representation, the court employs a highly deferential standard of review and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Strickland</u>, 466 U.S. at 689 (citation and internal quotation marks omitted). <u>See also</u> <u>Knight v. Spencer</u>, 447 F.3d 6, 15 (1st Cir. 2006) ("It is only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it, that the ineffective assistance prong is satisfied.") (citation and internal punctuation omitted).

In other words, to satisfy the first prong of the <u>Strickland</u> test, a petitioner must demonstrate that his counsel made errors that were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Smullen v. United States</u>, 94 F.3d 20, 23 (1st Cir. 1996) (quoting <u>Strickland</u>, 466 U.S. at 687). To satisfy the second prong of the <u>Strickland</u> test, a petitioner must show "actual prejudice," by demonstrating that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Janosky v. St. Amand</u>, 594 F.3d 39, 45 (1st Cir. 2010) (quoting <u>Strickland</u>, 466 U.S. at 694). A reasonable probability is one "sufficient to undermine confidence in the outcome." <u>Id</u>.

Given that standard, a petitioner asserting an ineffective assistance of counsel claim bears "a highly demanding and heavy burden. [His] failure to satisfy one prong of the <u>Strickland</u> analysis obviates the need for a court to consider the remaining prong." <u>Knight</u>, 447 F.3d at 15 (citations omitted).

**Discussion**

To obtain habeas corpus relief, then, Huard must: (1) show that Officer Cogswell's warrantless entries into his basement - first, in hot pursuit of Huard and, later, to recover his hat -

7

and the resulting seizure of the firearm were unconstitutional; and (2) overcome the presumption that counsel's decision not to challenge the admissibility of the seized firearm at trial falls within the bounds of a reasonable trial strategy; and (3) demonstrate that the failure to challenge the admissibility of the firearm was "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," Strickland, 466 U.S. at 687; and (4) show that but for the introduction of the firearm into evidence, there is a reasonable possibility that the outcome of his trial would have been different.

The basic premise of Huard's habeas petition - that the police officer's warrantless entries into the basement and subsequent seizure of the firearm violated his Fourth Amendment rights - is, at best, weak. Once Huard refused to stop when Officer Cogswell attempted to pull him over and, instead, chose to flee, leading the officer on a high-speed chase through residential areas, he became a fleeing felon.[1] The officer was,

---

[1] Under Massachusetts law, buying or receiving stolen goods (like the license plates Huard had on his vehicle) is punishable by "imprisonment in jail . . . for not more than two and one half years." M.G.L. ch. 266, § 60. Operating a motor vehicle "negligently so that the lives or safety of the public might be endangered" is punishable by "imprisonment for not less than two weeks nor more than two years." M.G.L. ch. 90 § 24(2)(a). Officer Cogswell had ample reason to believe Huard had committed one or both of those offenses.

then, plainly justified in <u>pursuing</u> Huard, into the basement. <u>See generally</u> <u>United States v. Martins</u>, 413 F.3d 139, 146 (1st Cir. 2005); <u>United States v. Santana</u>, 427 U.S. 38, 42-43 (1976). Accordingly, Officer Cogswell's initial presence in the basement was lawful. And, while the point might be plausibly debated, it is unlikely that Officer Cogswell was obligated to obtain a search warrant before re-entering the basement to recover the hat that Huard knocked off while resisting a lawful arrest. The elapsed time after removing Huard was brief, and the process of taking him into custody was ongoing. But, even assuming, for argument's sake, that the firearm was seized in violation of the Fourth Amendment, <u>and</u> further assuming that counsel's failure to seek its exclusion or challenge its admissibility at trial was not based upon any reasonable trial strategy, <u>and</u> further assuming that counsel's failure rendered his legal representation constitutionally deficient, Huard still has not shown entitlement to habeas relief under these circumstances.

   The firearm, while constituting evidence relevant to the charges being tried, was not critical to Huard's convictions, nor was it particularly compelling evidence. No direct evidence established that the seized firearm was the one Huard used in the robbery. That the firearm was taken from Huard shortly after the robbery tended to show that Huard had access to and possessed a

firearm like the one used in the robbery, and permitted a reasonable inference that the firearm later found in his possession was the very one used in the robbery. But, evidence of those facts had already been presented by Claps, who testified that, prior to the robbery, she had seen Huard with a black and silver handgun, generally matching the description of the firearm used by the credit union robber who wore the red and white jacket. <u>United States v. Huard</u>, Case no. 06-cr-117-SM, Trial Transcript Day 2, Afternoon Session (document no. 40), at 39. And, witnesses to the robbery, as well as the surveillance video established that the robber in the red and white jacket had a firearm in his possession and brandished it. Whether the particular firearm introduced in evidence was in fact the firearm used during the robbery was not critical, and not even significant. None of the charges being tried required proof that a specific firearm was used by Huard.

More importantly, however, the evidence introduced by the prosecution - some of which is recounted above - overwhelmingly established that Huard was the masked gunman wearing a red and white jacket who robbed the credit union along with King. Consequently, even if Huard could establish that the firearm was seized in violation of his Fourth Amendment rights, and even if he could demonstrate that trial counsel's failure to seek its

suppression, or object to its introduction at trial, deprived him of his Sixth Amendment rights, he still could not show (and has not shown) that he suffered any prejudice as a result.  Given the overwhelming evidence of Huard's guilt, the outcome of the trial would not have been different had the seized handgun not been introduced into evidence.

### Conclusion

The evidence of Huard's guilt - absent the firearm - was simply overwhelming.  As a result, he has not (and cannot) satisfy the second prong of the Strickland test.  That is to say, he has failed to show that "there is a reasonable probability that, absent the [alleged] errors, the factfinder would have had a reasonable doubt respecting guilt."  Strickland, 466 U.S. at 695.

The petition for habeas corpus relief (document no. 1) is denied.  The court declines to issue a certificate of appealability, but petitioner may seek such a certificate from the court of appeals under Federal Rule of Appellate Procedure 22.  See Rule 11, Federal Rules Governing Section 2254 Cases (2010); 28 U.S.C. § 2253(c).  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

November 22, 2010

cc: David A. Vicinanzo, Esq.
    Aixa Maldonado-Quinones, AUSA